IN THE MATTER OF THE PARENTAL RIGHTS AS TO N.J.

DAWN M., APPELLANT, *v.* NEVADA STATE DIVISION OF CHILD AND FAMILY SERVICES; AND FAYE CAVENDER, RESPONDENTS.

No. 51125

December 24, 2009      221 P.3d 1255

*Law Office of John C. Brown* and *John C. Brown*, Alamo, for Appellant.

*Catherine Cortez Masto*, Attorney General, and *Shannon C. Richards*, Deputy Attorney General, Carson City, for Respondents.

## OPINION

By the Court, SAITTA, J.:

In this appeal, we resolve questions concerning the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963 (2006). Specifically, we address what evidentiary standards apply in parental termination cases involving the ICWA. We also consider whether the Existing Indian Family (EIF) doctrine, a judicially created exception to the ICWA, applies in those cases in which neither the Native American parent nor the tribe is contesting termination.

We conclude that a dual-standard burden of proof is appropriate for evidentiary findings in parental termination cases involving the ICWA. Therefore, the higher beyond-a-reasonable-doubt evidentiary standards of the ICWA will be used for ICWA-related findings, and Nevada's clear-and-convincing evidence standard will apply to state law findings. We further hold that under specific circumstances, such as when the breakup of a Native American family is not at issue, application of the EIF doctrine may be appropriate.

### FACTS AND PROCEDURAL HISTORY

N.J. was born in Nevada in September 2005, two weeks premature. At the time of her birth, N.J. and her mother, petitioner Dawn M., tested positive for marijuana and methamphetamine. N.J. suffered respiratory problems and was flown to a children's hospital in Utah. Having determined that Dawn had exposed N.J. to drugs while in utero, respondent Nevada State Division of Child and Family Services (DCFS) became involved and worked with Dawn to find

a safe placement for not only N.J., but also Dawn's two other minor children. On September 16, 2005, Dawn informed DCFS that she was unable to secure a suitable placement for N.J. DCFS was unable to locate the putative father, Javy J. On September 20, 2005, N.J. was released from the hospital and placed in foster care, where she remains today.

In October 2005, Javy made contact with DCFS. Subsequent DNA tests showed that Javy was the biological father of N.J. However, according to DCFS, Javy denied paternity. Moreover, he never made further contact with DCFS, nor did he ever contact N.J., acknowledge her, or petition the court to establish his parental rights. It was determined that Javy is an enrolled member of the Ely Shoshone Tribe, and therefore, N.J. was eligible to become a member of the tribe. Yet the Ely Shoshone Tribe did not intervene in the underlying case, and its only participation was to provide expert testimony when called upon. Furthermore, Dawn is neither a member of the Ely Shoshone Tribe nor any other Native American tribe.

DCFS made arrangements for Dawn to visit N.J. and created a case plan for her to follow. In addition, DCFS referred Dawn for a drug and alcohol evaluation and to parenting and mental health classes. In May 2007, due to Dawn's continued drug use and failure to abide by the case plan, DCFS filed a petition to terminate her parental rights as to N.J.

At the parental rights termination hearing, DCFS presented testimony that for the first 18 months of N.J.'s life, Dawn continued to test positive for marijuana and methamphetamine. It further established that it was not until the spring of 2007, more than 18 months after N.J.'s birth, that Dawn showed more compliance with her case plan by maintaining sobriety and attending mental health appointments, as well as visitation appointments with N.J. However, Dawn managed to maintain only a few months of sobriety, testing positive for illegal substances again in October 2007.

The testimony showed that DCFS was seeking termination of Dawn's parental rights because reunification efforts had failed as a result of her continued drug use. Respondent Faye Cavender, a social worker with DCFS, stated that she witnessed Dawn fall asleep during some of her visits with N.J. She testified that Dawn's continued struggle with drugs; the lack of a meaningful bond between Dawn and N.J.; the ongoing relationship between Dawn and her boyfriend, which was described as a domestic violence situation; and the fact that N.J.'s entire life had been spent in foster care were all factors that led the agency to seek termination of Dawn's parental rights.

N.J.'s foster mother, Karla, also provided relevant testimony that showed that N.J. was fully integrated into the foster family. Karla testified that since the day she and her husband, Mark, brought a fragile N.J. home, they had worked to enable N.J. to thrive physi-

cally by taking her to all of her doctor appointments. They also worked on supporting her emotional needs. Karla explained that both she and Mark had Native American ancestry and would help educate N.J. about her tribal roots. She also provided detailed testimony regarding N.J.'s close bond with Mark and the couple's other children. Karla testified that the family would adopt N.J. if the petition for termination of parental rights was granted.

Jacqueline Volkmann, a clinical social worker with DCFS with 15 years of experience, who had an opportunity to observe N.J. with her foster family, testified that N.J. was integrated into the family. In Volkmann's opinion, removing N.J. from the only family she had ever known would be traumatic for the child. In addition, Volkmann testified that in her experiences dealing with methamphetamine users, it was impossible to parent well on even the lowest dosage of the drug.

DCFS also presented the testimony of Diane Buckner, the chairperson and health director for the Ely Shoshone Tribe. As to the traditions of the tribe, Buckner explained that the tribe is so integrated in the non-native community that each family chooses what tradition it will practice. Buckner stated that she had no concerns about N.J.'s placement with a non-native family. She explained that upon her review of Dawn's case file, it was her opinion that returning N.J. to Dawn would be problematic. However, during cross-examination, Buckner testified that she did not feel qualified to make such an assessment.

Dawn testified on her own behalf, admitting to her struggles with alcohol, marijuana, and methamphetamine abuse. Dawn admitted that during the first year of N.J.'s life, she may have missed more than half of the scheduled visits with her daughter because she was not given adequate notice. Dawn stated that she and N.J. had bonded.

Following the hearing, the district court issued an order granting DCFS's petition for termination of parental rights. In its order, the district court explained that it applied a dual-level evidentiary standard, using a clear-and-convincing standard for state law findings and the ICWA's higher beyond-a-reasonable-doubt standard for the ICWA findings. Accordingly, it found by clear and convincing evidence that N.J.'s best interest would be served by terminating Dawn's parental rights. However, it determined that DCFS failed to meet the ICWA's higher evidentiary standard. In making this determination, it found that Buckner, though a qualified tribal expert, was not qualified to testify whether continued custody by either of N.J.'s parents would result in serious harm. In noting this evidentiary deficiency, the district court determined that application of the EIF doctrine was appropriate. The EIF doctrine is a judicially created exception to the ICWA. The district court reasoned that in some cases,

like N.J.'s, in which neither the Native American parent nor the tribe was contesting the termination and the breakup of a Native American family was not at issue, the EIF doctrine was appropriate. Accordingly, it granted DCFS's petition to terminate Dawn's parental rights, and she appeals.

## DISCUSSION

This appeal involves a child who is eligible for enrollment with the Ely Shoshone Tribe. The Tribe sent a letter to DCFS indicating that N.J.'s putative father, Javy, is an enrolled member, and therefore, N.J. is eligible for enrollment. Accordingly, N.J. is a Native American child, and the parental termination proceedings are subject to the ICWA. *See Matter of Petition of Phillip A. C.*, 122 Nev. 1284, 1291, 149 P.3d 51, 56 (2006).

On appeal, Dawn raises two overarching issues. She asserts that the district court erred when it found clear and convincing evidence of parental fault. Dawn additionally contends that the EIF doctrine should not apply in this case. In resolving these issues, we first address the evidentiary standard of parental termination cases involving the ICWA. We adopt the dual-standard approach, which is used in the majority of states and requires state law grounds for termination to be proved by a clear-and-convincing standard and the ICWA grounds for termination to be proved by the higher beyond-a-reasonable-doubt standard. Additionally, we hold that the EIF doctrine is applicable under limited circumstances, such as when neither the Native American parent nor the tribe is contesting the termination.

### Evidentiary standards

As a threshold issue, we must first define the evidentiary standards applicable in this case. The specific issue before us is the interplay between Nevada's and the ICWA's standards of proof in parental termination cases.

Nevada has a clear-and-convincing evidentiary standard for parental termination cases, *Matter of Parental Rights as to D.R.H.*, 120 Nev. 422, 428, 92 P.3d 1230, 1234 (2004), while the ICWA requires that a beyond-a-reasonable-doubt evidentiary standard be met before granting a petition for termination of parental rights. 25 U.S.C. § 1912(f) (2006). When a case arises, such as this, where both standards are implicated, the fact-finder is faced with two competing standards. In reconciling this difference, we conclude that the state standard applies to state law findings and the ICWA standard

applies to federal law findings. We find support for our holding in the federal statutes' language.

When interpreting a statute with clear and unambiguous language, the apparent intent of the statute will be given effect, thereby avoiding meaningless or unreasonable results. *Matter of Petition of Phillip A. C.*, 122 Nev. at 1293, 149 P.3d at 57. " 'When construing a specific portion of a statute, the statute should be read as a whole, and, where possible, the statute should be read to give meaning to all of its parts.' " *Id.* at 1293, 149 P.3d at 57-58 (quoting *Building & Constr. Trades v. Public Works*, 108 Nev. 605, 610, 836 P.2d 633, 636 (1992)). This court has held that statutes with a protective purpose, such as the ICWA, should be "liberally construed in order to effectuate the intended benefits." *Id.* at 1293, 149 P.3d at 58.

By its own terms, 25 U.S.C. § 1902 describes the ICWA as setting forth "minimum Federal standards" for the removal of Native American children from their families. The language, therefore, does *not* expressly provide a uniform standard, but rather, creates the minimum criterion for ICWA-related findings. In another section of the ICWA, the evidentiary standard issue is addressed more directly:

> [i]n any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent or [Native American] custodian of [a Native American] child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard.

*Id.* § 1921. We determine that these sections read together to effectuate the ICWA's intended benefits—mainly the best interests of Native American children—require the stricter evidentiary standard of the ICWA to only apply to findings related to the federal statute. We find support for our interpretation of the ICWA in a recent decision by the Arizona Supreme Court, which noted that almost every state court that has considered this issue has concluded that the "ICWA allows states to specify the standard of proof for state-law findings distinct from the findings required by ICWA." *Valerie M. v. Arizona Dept. of Econom. Sec.*, 198 P.3d 1203, 1207 (Ariz. 2009); *see also Matter of J.R.B.*, 715 P.2d 1170, 1171 (Alaska 1986); *In Interest of H.A.M.*, 961 P.2d 716, 721 (Kan. Ct. App. 1998); *In re T.F.*, 681 N.W.2d 786, 791-92 (N.D. 2004). Accordingly, so do we. With those evidentiary principles in mind, we now turn to the issue of whether the evidence presented supported a finding of parental fault warranting termination of Dawn's parental rights. We begin our analysis with Nevada's evidentiary standard.

*Clear-and-convincing standard*

In Nevada, to terminate parental rights, "a petitioner must prove by clear and convincing evidence that termination is in the child's best interest" and that parental fault exists. *Matter of Parental Rights as to D.R.H.*, 120 Nev. at 428, 92 P.3d at 1234; *see* NRS 128.105. This court will uphold a district court's order to terminate parental rights if substantial evidence supports the decision. *Matter of Parental Rights as to D.R.H.*, 120 Nev. at 428, 92 P.3d at 1234.

*Child's best interest*

In determining what is in a child's best interest, the district court must consider the child's continuing need for "proper, physical, mental and emotional growth and development." NRS 128.005(2)(c). It is presumed that termination of parental rights is in the child's best interest if a child has been in foster care for 14 of any 20 consecutive months. NRS 128.109(2). When this presumption applies, the parent bears the burden of presenting enough evidence to overcome the presumption. *Matter of Parental Rights as to A.J.G.*, 122 Nev. 1418, 1426, 148 P.3d 759, 764 (2006).

In the present case, N.J. has been in foster care almost her entire life. It was her foster mother, Karla, who took N.J. home after she was released from the hospital. At the time that DCFS filed the petition to terminate parental rights, N.J. had been living with her foster family for approximately 20 months. Therefore, the presumption of NRS 128.109(2) applied, and it was up to Dawn to overcome it. Dawn's failure to maintain sobriety and bond with her daughter demonstrate that she failed to overcome this presumption.

*Foster care considerations*

In instances where the child has been placed in foster care and the custodial agency institutes proceedings to terminate parental rights, with the ultimate goal of having the child's foster family adopt her, the district court must look at specific considerations, including whether the child has become integrated into the foster family "to the extent that [her] familial identity is with that family." NRS 128.108. Other considerations include "[t]he length of time the child has lived in a stable . . . foster home" and "[t]he permanence as a family unit of the foster family." NRS 128.108(4) and (5).

We conclude that there was substantial evidence that N.J. had become fully integrated into the foster family. Volkmann, who spent time with N.J. and her foster parents, testified that N.J. would seek

out her foster parents for protection, comfort, and pleasure. She witnessed N.J. trip on two occasions and call out for Mark, her foster father, for comfort. Volkmann further testified that it would be traumatic for N.J. if she was removed from the foster home. N.J.'s foster mother, Karla, testified that N.J. had bonded not only with her and her husband, but also with Karla and Mark's other children. With the foster family, N.J. has thrived, and Karla and Mark have provided for N.J.'s medical needs since they brought her home from the hospital. The family intends to permanently adopt N.J. given the opportunity. In sum, the foster care considerations in this case supported the district court's finding that termination of Dawn's parental rights was in N.J.'s best interest.

### Parental fault

Dawn argues that there was not substantial evidence of parental fault. Specifically, she asserts that the district court improperly gave too much weight to the evidence of her drug use and ignored the brief period of sobriety. We disagree.

The district court found parental fault on the following grounds: neglect, unfitness, and token efforts. We consider each in turn.

### Neglect

In Nevada, a child is considered neglected if a parent "neglects or refuses to provide proper or necessary subsistence, education, medical or . . . other care necessary for [the child's] health, morals or well-being." NRS 128.014(2). NRS 128.106(4) provides that when determining neglect, the court shall consider whether excessive drug and alcohol use interfered with the parent's ability to care for the child. And NRS 128.106(8) requires the court to consider the inability of public agencies to reunite the parent and child, despite reasonable efforts.

With regard to neglect, the district court's findings were as follows: Dawn was not able to care for N.J. from the time the child was born because of Dawn's ongoing addiction to drugs. During the first 17 months of N.J.'s life, Dawn made minimal efforts to bond with her daughter, missed more than half of the scheduled visitations, and continued to use drugs. N.J. was born and diagnosed with a failure to thrive, due *possibly* to Dawn's use of alcohol, methamphetamine, and marijuana during pregnancy. Dawn did not attend N.J.'s medical appointments to keep up with N.J.'s physical progress. Additionally, Dawn has never provided any financial assistance to N.J. Moreover, DCFS made active efforts to reunite mother and daughter by providing a case plan and offering Dawn the opportunity to visit N.J. as much as five times a week. It is clear

from the record that further efforts would be futile because of Dawn's continued drug use and the lack of a bond between her and N.J. Accordingly, we conclude that substantial evidence supports the district court's finding of neglect.

## Unfitness

An unfit parent is "any parent of a child who, by reason of his fault or habit or conduct toward the child or other persons, fails to provide such child with proper care, guidance and support." NRS 128.018. What constitutes being unfit can vary from case to case but generally includes continued drug use, criminal activity, domestic violence, or an overall inability to provide for the child's " 'physical, mental or emotional health and development.' " *Matter of Parental Rights as to D.R.H.*, 120 Nev. at 429-30, 92 P.3d at 1235 (quoting NRS 128.106(6)); *see Matter of Parental Rights as to K.D.L.*, 118 Nev. 737, 746-47, 58 P.3d 181, 187 (2002).

The district court properly determined that Dawn was an unfit parent because of her continued drug use, her failure to provide for any aspect of N.J.'s physical or mental well-being, and her ongoing relationship with her then-boyfriend, which was described as a domestic violence situation. Dawn argues that the district court overlooked the few months of sobriety she maintained in 2007; however, she misstates the record. The district court indeed took note of the brief period of sobriety, but it appropriately ruled that Dawn was unfit because she continued to test positive for drugs. In the months leading up to the termination of parental rights hearing, Dawn again used methamphetamine, was subsequently arrested, and spent 30 days in jail. Additionally, an experienced social worker, Volkmann, testified that in her experience with recovering addicts, it was practically impossible to parent on even the lowest dose of methamphetamine. The evidence of Dawn's unfitness as a parent was overwhelming, and the district court did not improperly emphasize any one period of time. Accordingly, we conclude that substantial evidence supports the district court's finding of parental unfitness.

## Token efforts

Pursuant to NRS 128.105(2)(f), parental fault may be established when a parent engages in only token efforts to (1) "support or communicate with the child"; (2) "prevent neglect of the child"; (3) "avoid being an unfit parent"; or (4) "eliminate the risk of serious physical, mental or emotional [harm] to the child." Moreover, NRS 128.109(1)(a) and (2) state that if a child has been in foster care for 14 months of a 20-month period, it is presumed that the parent has made only token efforts to care for the child and that termination of parental rights is in the child's best interest.

The district court, while not addressing each of the four factors, determined that Dawn had, at best, made token efforts as defined by NRS 128.105(2)(f). We agree.

First, the record demonstrates that Dawn made only token efforts to support or communicate with N.J. during the first 18 months of the child's life. While not employed, Dawn received disability income, but she failed to provide any financial assistance for N.J.'s care. In addition, Dawn was observed falling asleep during her visits with N.J. Moreover, Dawn only made token efforts to address her drug addiction some 17 months after N.J.'s birth. Her failure to address her drug issue and terminate an abusive domestic relationship demonstrate a lack of effort on Dawn's part to prevent neglect, avoid unfitness, and eliminate risk of serious emotional and physical harm to N.J. A mere few months of sobriety almost a year and one-half after N.J.'s birth is a token effort at best. Accordingly, we conclude that substantial evidence supports the district court's finding that Dawn made only token efforts to care for her daughter.

Having concluded that substantial evidence exists to support the district court's determination, pursuant to Nevada's clear-and-convincing evidentiary standard, that termination of Dawn's parental rights is in the best interest of N.J., we now turn to the issue of whether the evidence presented supports termination pursuant to the ICWA's higher evidentiary standard.

*Beyond-a-reasonable-doubt standard*

In passing the ICWA, Congress declared that it is the United States' policy to advance the best interests of Native American children and Native American families by establishing minimum federal standards for the removal and adoption of Native American children. 25 U.S.C. § 1902 (1978). Congress expressly stated that the ICWA was enacted in response to the "alarmingly high percentage" of Native American families that were broken up due to the oftentimes unwarranted removal of Native American children by nontribal public and private agencies. *Id.* § 1901(4). It further noted that state courts have "often failed to recognize the essential tribal relations of [Native American] people and the cultural and social standards prevailing in [Native American] communities and families." *Id.* § 1901(5). Those policy goals comport with the statute's higher evidentiary standards.

The ICWA requires that the district court make two findings before terminating the parental rights of a Native American child. First, there must be a

> determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or [Native

American] custodian is likely to result in serious emotional or physical damage to the child.

*Id.* § 1912(f). Second, the court must also be persuaded that

active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the [Native American] family and that these efforts have proved unsuccessful.

*Id.* § 1912(d). For the reasons set forth below, we agree with the district court that DCFS did not meet the ICWA's higher evidentiary standard, yet termination of parental rights was proper because of the application of the EIF doctrine.

*Qualified witness testimony*

The ICWA does not expressly define a qualified expert witness. We determine that NRS 128.093(2) is helpful. It states:

As used in this section, ''qualified expert witness'' includes, without limitation:

(a) [A Native American] person who has personal knowledge about the [Native American] child's tribe and its customs related to raising a child and the organization of the family; and

(b) A person who has:

(1) Substantial experience and training regarding the customs of [Native American] tribes related to raising a child; and

(2) Extensive knowledge of the social values and cultural influences of [Native American] tribes.

The district court determined that DCFS did not sufficiently meet the ICWA evidentiary standard because there was no qualified expert witness who testified as to the likelihood of serious physical or emotional harm to N.J. if she were returned to either parent. We agree.

While DCFS presented substantial evidence that Dawn was an unfit parent and termination of her parental rights was in N.J.'s best interest with regard to Nevada's standards, it did not meet its burden of proof pursuant to the ICWA. While the tribal expert provided by DCFS, Buckner, met the standards of NRS 128.093(2) because she was the chairperson of the Ely Shoshone Tribe and had substantial experience about the tribe and its customs related to raising children, she could not provide testimony that returning N.J. to Dawn would result in serious emotional or physical damage to the child as is required by § 1912(f). We note that one witness, Volkmann, a clinical social worker with DCFS, testified that removing N.J. from the fos-

ter family would be traumatic. However, she could not testify as to whether returning N.J. to Dawn would result in serious harm. Therefore, DCFS failed to meet the ICWA's higher evidentiary standard for termination of parental rights.

## The EIF doctrine

As the ICWA was enacted to protect against the unwarranted removal of Native American children from an existing Native American family unit and the resultant breakup of the Native American family, we agree with the district court's observation that the application of the ICWA to this case would serve only one purpose: to deprive N.J. of the only home she has ever known and come to love. We determine that the outcome would be counter to the ICWA's goal of protecting the best interests of Native American children.

The judicially created EIF doctrine is an exception to the ICWA that precludes its application in cases where the court determines that there is no existing Native American family, meaning the child is not, and never was, part of a Native American family or tribe. *In re Alexandria Y.*, 53 Cal. Rptr. 2d 679, 686 (Ct. App. 1996) (holding that "recognition of the [EIF] doctrine is necessary to avoid serious constitutional flaws in the ICWA").

We hold that the EIF doctrine should be used on a case-by-case basis to avoid results that are counter to the ICWA's policy goal of protecting the best interest of a Native American child. In the present case, we recognize that N.J.'s interest is protected by the ICWA because her putative father is a member of the Ely Shoshone Tribe. Her father, however, is not contesting the termination, nor is the tribe. The termination will not result in the breakup of a Native American family. Indeed, the only person contesting the termination is the non-Native American parent, Dawn. In addition, the foster family that is taking care of N.J. plans on adopting N.J. and is committed to educating her about her heritage. Those factors lead us to conclude that in this circumstance, the application of the EIF doctrine is appropriate because, while it is an exception to the ICWA, in such scenarios it serves to advance the ICWA's goal to protect the best interests of Native American children. Because we conclude that the EIF doctrine is applicable, we need not reach the issue of whether DCFS made active efforts, pursuant to the ICWA, *see* 25 U.S.C. § 1912(d), to reunite Dawn and N.J., as application of the EIF doctrine negates the necessity of that inquiry.

## *CONCLUSION*

In parental termination cases in which the ICWA is implicated, we conclude that a dual-evidentiary standard is appropriate. The district court shall use Nevada's clear-and-convincing standard for state law findings and the ICWA's higher beyond-a-reasonable-doubt standard for ICWA-related findings. We further hold that the judicially created exception to the ICWA, the EIF doctrine, may be applicable on a case-by-case basis. Specifically, when a non-Native American parent is challenging the termination of parental rights, the breakup of a Native American family is not at issue, and neither the tribe nor the Native American parent is contesting the termination, we conclude that application of the EIF doctrine may be appropriate. In the present case, we conclude that substantial evidence supports the district court's determination that termination of parental rights was in the child's best interest and that parental fault existed. We further determine that the district court correctly applied the EIF doctrine in this case. Accordingly, we affirm the district court's judgment.

HARDESTY, C.J., PARRAGUIRRE, DOUGLAS, CHERRY, GIBBONS, and PICKERING, JJ., concur.