# NO. 12-14-00061-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF K. S.,* | § | *APPEAL FROM THE 392ND* |
| *A CHILD* | § | *JUDICIAL DISTRICT COURT* |
| | § | *HENDERSON COUNTY, TEXAS* |

*OPINION*

D.S. appeals the termination of her parental rights to K.S. and raises seven issues on appeal. We affirm.

## BACKGROUND

D.S. is the mother of K.S., who was born on March 14, 2011; both are from Oklahoma City, Oklahoma.[1]  D.S. and K.S. had been traveling through Texas when a report of neglectful supervision was reported at a Texas hospital, which led to the ultimate removal of K.S. from D.S.'s custody.  On January 7, 2013, the Department of Family and Protective Services (the Department or CPS) filed a petition for protection of K.S., for conservatorship, and for termination in a suit affecting the parent-child relationship.  That same day, the trial court signed an emergency order naming the Department as temporary sole managing conservator of K.S.  On January 14, 2013, a representative from the Cherokee Nation advised the trial court that it was intervening in the case on K.S.'s behalf.  The hearing concluded the next day, and the trial court ordered the Department to continue as temporary managing conservator of K.S.

---

[1] According to the Department's amended petition, the father of K.S. is unknown.  He is not a party to this appeal.

On January 27, 2014, a jury was selected and the case proceeded to trial.[2] Ultimately, it was determined that the parent-child relationship between D.S. and K.S. should be terminated. This appeal followed.

## INDIAN CHILD WELFARE ACT

At the time of trial, D.S. was a member of the Cherokee tribe. Thus, K.S. qualifies as an "Indian child" under the Indian Child Welfare Act (ICWA).[3] *See* Indian Child Welfare Act of 1978, 25 U.S.C.A. §§ 1901-1963 (West, Westlaw current through P.L. 113-125 (excluding P.L. 113-121)).

In 1978, Congress recognized that the United States has a direct interest in protecting Indian children who are members of or are eligible for membership in an Indian tribe. Congress declared it this Nation's policy

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in . . . homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

*See* 25 U.S.C.A. § 1902.

The protection of the tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child that is distinct from, but on a parity with, the interest of the parents. ***Miss. Band of Choctaw Indians v. Holyfield***, 490 U.S. 30, 52, 109 S. Ct. 1597, 1610, 104 L. Ed. 2d 29 (1989) (quoting ***In re Adoption of Halloway***, 732 P.2d 962, 969-70 (Utah 1986)).

D.S. raises seven issues relating to the trial court's application of the ICWA to this case.

---

[2] The trial court retained the suit on its docket for an additional six months beyond the statutory dismissal date. *See* TEX. FAM. CODE ANN. § 263.401(b) (West 2014) (providing that a court may retain a suit on its docket if extraordinary circumstances require the child to remain in the temporary managing conservatorship of the department and the department's continued appointment as temporary managing conservator is in the child's best interest).

[3] The Indian Child Welfare Act defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. . . ." Indian Child Welfare Act of 1978, 25 U.S.C.A. § 1903(4) (West, Westlaw current through P.L. 113-125 (excluding P.L. 113-121)).

In her first issue, D.S. contends that the trial court erred by failing to provide proper notification of the pending proceedings and right of intervention in accordance with the required notice procedures of the ICWA.[4]  The trial court's application of the ICWA is a question of law, which we review de novo.  *See also **In re J.J.C.***, 302 S.W.3d 896, 902 (Tex. App.—Waco 2009, no pet.).

### Applicable Law

Section 1912(a) requires that, in any involuntary proceeding in a state court involving an Indian child, "the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention."  25 U.S.C.A. § 1912(a).  An "Indian child's tribe" means "(a) the Indian tribe in which an Indian child is a member or eligible for membership or (b), in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts[.]"  25 U.S.C.A. § 1903(5).

### Discussion

Although D.S. is a member of the Cherokee Nation, the record shows that she may have ties to the Choctaw Nation tribe because D.S. claimed that her father was affiliated in some way with that tribe.  Cherokee Nation had actual notice of the proceedings involving K.S., but there is no evidence that Choctaw Nation was ever notified of the proceedings.

D.S. contends that the proceedings should be invalidated because Choctaw Nation did not receive notice and because the notice afforded to Cherokee Nation did not comply with Section 1912(a).  Due to D.S.'s membership in Cherokee Nation and ties with Choctaw Nation, K.S. could be a member of or eligible for membership in both tribes, but the trial court did not determine which tribe was K.S.'s tribe.  We abated the appeal for the trial court to conduct a hearing to determine K.S.'s tribe under the ICWA.[5]

---

[4] All statutory references are to the ICWA unless otherwise indicated.

[5] When an Indian child is a member of more than one tribe or is eligible for membership in more than one tribe but is not a member of any of them, "the court is called upon to determine with which tribe the child has more significant contacts."  BUREAU OF INDIAN AFFAIRS GUIDELINES FOR STATE COURTS; INDIAN CHILD CUSTODY PROCEEDINGS, 44 FED. REG. 67,584, 67,590 (Nov. 26, 1979) (*Guidelines*).

The supplemental clerk's and reporter's records show that the trial court conducted the hearing to determine K.S.'s tribe on July 9, 2014. Both tribes received notice of the hearing to determine K.S.'s tribe by registered mail with return receipt requested. Choctaw Nation did not file a response or appear at the hearing.[6] The Cherokee Nation representative, Kristi Crawford, appeared and testified that K.S. has contacts with Cherokee Nation through her mother, grandmother, and great grandparents. She testified that as a member of the Cherokee Nation tribe, D.S. has received assistance prior to and during the pendency of this case. Crawford further testified that a "cultural packet" had been sent to K.S.'s foster home so the foster mother could teach K.S. about her culture.

Crawford had no knowledge about the extent to which D.S.'s father was affiliated with Choctaw Nation, and there is no evidence that K.S. has any significant contacts with Choctaw Nation. Ultimately, the trial court issued written findings and designated Cherokee Nation as K.S.'s tribe. Because Cherokee Nation is K.S.'s tribe for purposes of the ICWA, we limit our discussion of the notice requirements as they pertain to the Cherokee Nation.

*Cherokee Nation's Actual Notice*

Cherokee Nation became involved "very early" in this case, but there is no showing that the Department strictly complied with Section 1912(a)'s requirements.[7] Cherokee Nation had a representative attend court hearings and transport D.S. to Texas for visits and services, and conducted home visits to D.S.'s apartment in Oklahoma City. However, Section 1914 provides that an order of termination may be invalidated for failing to comply with Section 1912. *See* 25 U.S.C.A. § 1914. Thus, the question before us is whether the trial court's order should be invalidated for failing to strictly comply with Section 1912(a)'s notice requirements when Cherokee Nation had actual notice of, and involvement in, these proceedings.

---

[6] The Department filed a letter from the Choctaw Nation of Oklahoma that was addressed to the Henderson County District Attorney and dated July 1, 2014. The letter states, "We have researched our records with the information you provided and we were unable to establish Indian heritage" for K.S. We note that the trial court "took judicial notice" of the file, but the trial court may not take judicial notice of the truth of any factual allegations contained in its file. *See In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.).

[7] Although Crawford testified that the Department complied with the notice provisions, the clerk's record contains none of the documentation described by the *Guidelines* relating to the ICWA notice requirements. *See* 25 U.S.C.A. § 1912(a) (West, Westlaw current through PL 113-25 (excluding P.L. 113-121)); *Guidelines*, 44 FED. REG. 67,593 ("The original or a copy of each notice sent pursuant to this section [Section 1912] shall be filed with the court together with any return receipts or other proof of service.").

i.    *Texas Cases*

The Fort Worth and Waco courts of appeals have held that strict compliance with the ICWA notice provisions is required. *See **In re J.J.C.**,* 302 S.W.3d at 902; ***In re R.R., Jr.**,* 294 S.W.3d 213, 224-25 (Tex. App.—Fort Worth 2009, no pet.). But in those cases, the children had not been determined to be "Indian children," and the ultimate question was whether the ICWA applied to the termination proceedings. *See **In re J.J.C.**,* 302 S.W.3d at 902; ***In re R.R., Jr.**,* 294 S.W.3d at 227. The courts of appeals "conditionally affirmed" the termination orders, holding that they would affirm if, after proper notice and a hearing, the trial court determined that the children were not Indian children. ***In re J.J.C.**,* 302 S.W.3d at 902; ***In re R.R., Jr.**,* 294 S.W.3d at 227. But if the trial court determined that the children were Indian children, the courts of appeals would reverse the termination order and remand for a new trial. ***In re J.J.C.**,* 302 S.W.3d at 902; ***In re R.R., Jr.**,* 294 S.W.3d at 227.

We are unaware of any Texas cases involving the termination of parental rights under the ICWA where the Indian child's tribe received actual notice of the proceedings, but did not receive the notice required by Section 1912(a).

ii.    *The BIA Guidelines and Other Jurisdictions*

After Congress passed the ICWA, the Bureau of Indian Affairs created guidelines for state courts to use in Indian child custody proceedings to assist with the interpretation of the ICWA. *See* BUREAU OF INDIAN AFFAIRS GUIDELINES FOR STATE COURTS; INDIAN CHILD CUSTODY PROCEEDINGS, 44 FED. REG. 67,584 (Nov. 26, 1979). The *Guidelines* state that notice is necessary and that certain information in the notice is required "so the persons who receive notice will be able to exercise their rights in a timely manner." ***Id.**,* 44 FED. REG. 67,594. But the *Guidelines* do not address whether the policy interests of the ICWA can be realized upon a tribe's actual notice of, and involvement in, a proceeding without having received the notice specified in Section 1912(a). *See generally **id.***

Courts from other jurisdictions have refused to invalidate termination orders for failure to satisfy Section 1912(a)'s requirements when the interested tribe had actual notice of the proceedings. *See **In re T.M.**,* 628 N.W.2d 570, 575 (Mich. 2001), *overruled on other grounds by **In re Morris**,* 815 N.W.2d 62 (Mich. 2012); ***In re D.M.**,* 685 N.W.2d 768, 771 (S.D. 2004); ***Matter of Welfare of M.S.S.**,* 936 P.2d 36, 40, *review denied,* 943 P.2d 663 (1997), *cert. denied sub nom.,* ***Sather v. Wash.**,* 523 U.S. 1098, 118 S. Ct. 1564, 140 L. Ed. 2d 798 (1998) ("Failure to provide

5

the required notice mandates remand unless the tribe has participated in the proceedings or expressly indicated that it has no interest in the proceedings.").

Most recently, the Supreme Court of Nevada determined that an order of termination could not be invalidated for failing to provide the notice required by Section 1912(a) of the ICWA because the parent and tribe had actual notice of the termination proceedings. *See In re Parental Rights as to S.M.M.D.*, 272 P.3d 126, 134 (Nev. 2012). Specifically, the court stated that "[w]hen actual notice of an action has been given irregularly in the content of the notice or the manner in which it was given does not render the notice inadequate." *Id*. (quoting RESTATEMENT (SECOND) OF JUDGMENT § 3 (1982)). We agree.

## Conclusion

In this case, Cherokee Nation had actual notice of the proceedings, intervened, and participated throughout the pendency of the case. There is no evidence that the failure to strictly comply with Section 1912(a)'s notice requirements negatively affected Cherokee Nation's interest in K.S. and in retaining K.S. in its society. *See Holyfield*, 490 U.S. at 37, 109 S. Ct. at 1602; *see also In re Termination of Parental Rights to Arianna R.G.*, 657 N.W.2d 363, 368 (Wisc. 2003) ("One of the purposes of the notice requirement is to enable an Indian tribe to participate. . . ."). Therefore, the trial court's order need not be invalidated due to the Department's failure to comply with Section 1912(a). Accordingly, we overrule D.S.'s first issue.

## PREEMPTION

In her second issue, D.S. contends that the trial court erred by making findings under the family code because it is impossible to simultaneously comply with the family code and the ICWA. As a result, D.S. contends that the ICWA preempts the family code. The Department contends that termination grounds under Section 161.001 of the family code are not mutually exclusive, and thus, are not preempted by the ICWA.

## Applicable Law

Under the Supremacy Clause of Article VI of the United States Constitution, Congress has the power to preempt state law. *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 690 (Tex. 1992) (citations omitted). State action may be preempted by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 121 S. Ct. 2404, 2414, 150 L. Ed.

6

2d 532 (2001). When Congress legislates in a field traditionally occupied by the states, such as family law, there is a presumption against preemption. *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151, 121 S. Ct. 1322, 1330, 149 L. Ed. 2d 264 (2001); *see also Lone Star Gas Co.*, 844 S.W.2d at 691.

We read state law provisions in harmony with federal law unless the state law provisions stand as an obstacle to the accomplishment and execution of congressional objectives, i.e., the ICWA. *See id.* (citing *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509, 109 S. Ct. 1262, 1273, 103 L. Ed. 2d 509 (1989)); *see also Caller-Times Publ'g Co., Inc. v. Triad Commc'n, Inc.*, 826 S.W.2d 576, 581 (Tex. 1992) ("[W]e seek to harmonize our interpretation with federal law to the extent it is consistent with the purpose of the Texas Antitrust Act. . . ."). In other words, "when the text of a pre[]emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre[]emption.'" *Altria Group, Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 543, 172 L. Ed. 2d 398 (2008) (citations omitted).

## Discussion

When Congress passed the ICWA, it recognized a special relationship between the United States and Indian tribes and their members, and assumed "responsibility for the protection and preservation of Indian tribes and their resources." *See* 25 U.S.C.A. § 1901(2). As we have previously stated, the ICWA establishes the "minimum Federal standards" for the removal and placement of Indian children. 25 U.S.C.A. § 1902. Additionally, Section 1921 provides that state law, rather than federal law, shall be applied if it "provides a higher standard of protection" to the rights of the parent or Indian child custodian. *See* 25 U.S.C.A. § 1921.

Congress found that the states have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. *See* 25 U.S.C.A. § 1901(5). Nevertheless, it did not expressly state that by enacting the ICWA it was preempting state law concerning child custody proceedings or that it intended for the ICWA to occupy the area of child custody proceedings completely. *See In re J.J.C.*, 302 SW.3d at 899. Accordingly, we must presume that Congress did not intend to preempt the Texas Family Code when it enacted the ICWA. *See Egelhoff*, 532 U.S. at 151, 121 S. Ct. at 1330; *Lone Star Gas Co.*, 844 S.W.2d at 691. And in addressing the preemption issue, we compare the family code provisions relating to the termination of the parent-child relationship with the pertinent ICWA provisions to determine whether the family code serves as an obstacle to the accomplishment and

7

execution of the objectives Congress sought to accomplish.  *See* ***Egelhoff***, 532 U.S. at 151, 121 S. Ct. at 1330; ***Lone Star Gas Co.***, 844 S.W.2d at 691.

The ICWA and the Texas Family Code address similar interests when a child is removed from his or her home because they both seek to protect the best interests of the child and to preserve family stability.  *See* 25 U.S.C.A. § 1902; TEX. FAM. CODE ANN. §§ 263.3026(b), 263.307 (West 2014); *see, e.g.*, ***In re D.S.P.***, 480 N.W.2d 234, 238 (Wisc. 1992).  The ICWA seeks to achieve this goal by requiring "active efforts" to prevent the breakup of the Indian family and proof beyond a reasonable doubt that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."  *See* 25 U.S.C.A. § 1912(d), (f).  The family code seeks to achieve this goal by requiring "reasonable efforts" to make it possible to return the child to the home and requiring clear and convincing evidence that (1) the parent has engaged in conduct described in Section 161.001(1) of the family code and that (2) termination of the parent-child relationship is in the child's best interest.  *See* TEX. FAM. CODE ANN. §§ 161.001, 262.001(b) (West 2014); *see also **id.*** § 263.307(b) (listing best interest factors).[8]

Our research has revealed that several courts apply state termination grounds concurrently with termination grounds under the ICWA.  *See* ***Marcia V. v. State***, 201 P.3d 496, 502 (Ala.

---

[8] D.S.'s parental rights were terminated under the following subsections of Texas Family Code Section 161.001, which authorizes the trial court to order termination of the parent-child relationship if it has found by clear and convincing evidence that the parent has

> (1)(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well[]being of the child;
>
> (1)(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well[]being of the child;
>
> (1)(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child
>
> . . .
>
> [and]
>
> (2) that termination is in the best interest of the child.

*See* TEX. FAM. CODE ANN. § 161.001 (West 2014).

8

2009); *Valerie M. v. Ariz. Dep't Econ. Sec.*, 198 P.3d 1203, 1207 (Ariz. 2009) (en banc); *In re Denice F.*, 658 A.2d 1070, 1072 (Me. 1995); *In re N.J.*, 221 P.3d 1255, 1260-61 (Nev. 2009); *In re D.S.P.*, 480 N.W.2d at 238. We are aware of only one case in which the court found that application of state law afforded less protection to parents or custodians of Indian children. *See People ex rel. J.S.B., Jr.*, 691 N.W.2d 611, 617 (S.D. 2005). In that case, state law recognized certain "aggravated circumstances" under which no reasonable efforts aimed at preventing the breakup of families were necessary. *Id.* The court concluded that even though state law excused the use of reasonable efforts for reunification, active efforts were still required in order for an order of termination to be valid under the ICWA. *See id.* at 616-20.

Generally, the concurrent application of the family code to proceedings involving Indian children provides additional protection to parents of Indian children because it requires the party seeking termination to prove state and federal grounds before the parent-child relationship may be terminated. *See* 25 U.S.C.A. § 1921; *see also In re D.S.P.*, 480 N.W.2d at 238. But when aggravated circumstances exist and reasonable efforts for reunification are not required by the family code, the ICWA requirements must still be satisfied because they provide a higher degree of protection than state law. *See* 25 U.S.C.A. §§ 1914, 1921; TEX. FAM. CODE ANN. § 262.2015 (West 2014).[9]

D.S. argues that it is impossible to comply with both statutes because the family code's best interest requirement is based on an "Anglo standard" while the ICWA is concerned with the "best interests of Indian children." To support her argument, she directs us to *In re W.D.H.*, 43 S.W.3d 30 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

In *In re W.D.H.*, a father of an Indian child challenged the termination of his parental rights because the trial court did not make a finding under Section 1912(f). *See id.* at 33. The trial court terminated the father's parental rights by applying the beyond a reasonable doubt standard to the findings under Section 161.001 of the family code. *Id.* at 35. The court of appeals held that it was error to terminate the father's parental rights in the absence of a finding under Section 1912(f),

---

[9] Section 262.2015 of the Texas Family Code provides that the requirement to make reasonable efforts to return the child to a parent may be waived upon a finding of aggravated circumstances. *See* TEX. FAM. CODE ANN. § 262.2015 (West 2014). As noted in *J.S.B., Jr.*, the ICWA provides no exception to its mandate requiring "active efforts" to prevent the breakup of the Indian family. *See People ex rel. J.S.B., Jr.*, 691 N.W.2d 611, 617 (S.D. 2005). Thus, an order for termination is subject to invalidation if the state fails to make active efforts as required under Section 1912(d) even if the facts show aggravated circumstances under the family code. *See* 25 U.S.C.A. § 1914.

and further stated that findings under the family code were improper because the family code conflicts with the ICWA. *Id.* The court reasoned that

> [t]he requirement under the Family Code that termination of the parent's rights must be in the best interest of the child is based on the "Anglo" standard for determining the best interest of the child. . . . When state courts make a determination regarding the best interest of the child, "they obviously consider the factors from their own perspective, that is, an Anglo-American point of view." . . . Therefore, we conclude that it is not possible to comply with both the two[]prong test of the Family Code, which requires a determination of the best interest of the child under the "Anglo" standard, and the ICWA, which views the best interest of the Indian child in the context of maintaining the child's relationship with the Indian Tribe, culture, and family.

*Id.* at 37.

Based upon our reading of the ICWA and sections 161.001 and 262.001 of the family code, we conclude that the family code does not serve as an obstacle to the realization of the ICWA's purpose. Therefore, we disagree that the family code cannot be read in harmony with the ICWA.[10]

The family code is not preempted each time an Indian child is involved in a child custody proceeding in Texas, namely a suit involving the termination of the parent-child relationship. *See, e.g.*, ***In re Denice F.***, 658 A.2d at 1072 ("The state grounds for termination of parental rights, unaffected by the ICWA, provide a supplemental degree of protection to parents facing a petition for termination of parental rights."); ***In re D.S.P.***, 480 N.W.2d at 238; *see also* ***In re N.J.***, 221 P.3d at 1260-61; ***Marcia V.***, 201 P.3d at 502. Thus, when the ICWA applies, both the ICWA and the Texas Family Code grounds for termination must be satisfied. *See* 25 U.S.C.A. § 1921. It was not error for the trial court to make findings under both the ICWA and the family code. Accordingly, we overrule D.S.'s second issue.

## TRIAL BY CONSENT

In her third issue, D.S. contends that the trial court erred in terminating her parental rights on ICWA grounds because they were not alleged in the Department's pleadings or tried by consent.

---

[10] In his concurrence, Justice Wittig states that the two statutes should be construed in harmony. *See **In re W.D.H.***, 43 S.W.3d 30, 40 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (Wittig, J., concurring).

10

**Standard of Review and Applicable Law**

Generally, a trial court's judgment must conform to the pleadings. *See* TEX. R. CIV. P. 301. But unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991).

To determine whether an issue was tried by consent, we examine the record for "trial of the issue" as opposed to "evidence of the issue." *In re S.A.A.*, 279 S.W.3d 853, 856 (Tex. App.—Dallas 2009, no pet.); *see also Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 780 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating that both parties understood what the issue was in the case, and the other party failed to make an appropriate complaint. *Id.* A party who allows an issue to be tried by consent and fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Id.*

The trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex. App.—Dallas 2005, pet. denied). An abuse of discretion occurs if the trial court acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Id.* at 772.

**Discussion**

The Department's first amended petition seeking termination of D.S.'s parental rights did not allege Section 1912(f) of the ICWA as a ground for termination. Nevertheless, testimony relating to the ICWA's requirements for termination was elicited by both the Department's and D.S.'s attorneys at trial.

The Cherokee Nation representative, Kristi Crawford, provided expert testimony relating to the ICWA's requirements for termination of D.S.'s parental rights. She testified that her role as a representative of Cherokee Nation was to ensure ICWA compliance.

Crawford testified as an expert witness with respect to the ICWA during the Department's direct examination, and was cross-examined by D.S.'s attorney on the requirements for termination of parental rights under the ICWA. Both the Department's and D.S.'s proposed charges included the following instruction:

11

> Additionally, you must find beyond a reasonable doubt that consistent with the Indian Child Welfare Act 25 U.S. § 1912, that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that these efforts have proved unsuccessful and that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

## Conclusion

By failing to object to the lack of pleading before the submission of the charge, D.S. failed to preserve this issue for appeal. *See Hartford*, 287 S.W.3d at 780. Moreover, the record shows trial by consent because D.S. included the ICWA grounds in her proposed charge. *See In re S.A.A.*, 279 S.W.3d at 856; *Hartford*, 287 S.W.3d at 780. The trial court did not abuse its discretion by terminating D.S.'s parental rights on grounds not raised in the Department's written pleadings. *See Case Corp.*, 184 S.W.3d at 771. Accordingly, we overrule D.S.'s third issue.

## BROAD FORM SUBMISSION

In her fourth issue, D.S. contends that the trial court erred by permitting "a broad-form submission jury charge . . . rather than multiple alternative submissions containing state grounds for termination and grounds for termination under the ICWA."

We review challenges to the jury charge under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). The trial court abuses its discretion only when it acts without reference to any guiding principles. *Id.* "In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions." TEX. R. CIV. P. 277. Absent extraordinary circumstances, the court must submit broad form questions. *E.B.*, 802 S.W.2d at 649.

## Discussion

At trial, D.S.'s attorney argued that the broad form question in the charge was not sufficient due to the "special provisions of the Indian Child Welfare Act" and argued that separate findings on the ICWA grounds were necessary. The question to which D.S. objected stated as follows:

> Should the parent-child relationship between [D.S.] and the child, [K.S.], be terminated?
>
> Answer "Yes" or "No" as to each child:
>
> [K.S.]……………………….. □ Yes          □ No

D.S. contends that it was not feasible to submit this question because the ICWA requires a higher burden of proof than the family code.[11]  But once the jury received the instructions on the law that applied to the grounds for termination under the family code and the ICWA, the controlling question under both statutes remained the same:  "Should the parent-child relationship between [D.S.] and the child, [K.S.] be terminated?  See *E.B.*, 802 S.W.2d at 649.[12]

The court's charge included the statutory language for termination of parental rights under the family code and the ICWA, and imposed the beyond a reasonable doubt standard on both state and federal grounds.  The trial court did not abuse its discretion in submitting the issue to the jury in broad form.  *See id.*  Accordingly, we overrule D.S.'s fourth issue.

---

[11] D.S. did not object to the trial court's requirement of proof "beyond a reasonable doubt" to terminate D.S.'s parental rights under the family code.

[12] The court's charge included the following instructions:

> For the parent-child relationship in this case to be terminated with respect to [D.S.], the mother of the child, [K.S.], the following sections **A, B** and **C** must be proven beyond a reasonable doubt.
>
> **A.**  It must be proven by beyond a reasonable doubt that at least one of the following events has occurred:
>
>   1.  [D.S.] has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well[]being of the child; or
>
>   2.  [D.S.] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well[]being of the child; or
>
>   3.  [D.S.] has failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;
>
> **B.**  Additionally, you must find beyond a reasonable doubt that consistent with the Indian Child Welfare Act 25 U.S. § 1912, that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that these efforts have proved unsuccessful and that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

The charge further instructed the jury that it must be proved beyond a reasonable doubt that termination of D.S.'s parental rights is in the child's best interest and listed a number of factors for consideration.

### CHILD'S PLACEMENT

In her fifth issue, D.S. contends that the trial court erred by failing to enforce Section 1915 regarding the placement of children. Section 1915 provides a list of placement preferences for Indian children in foster care or preadoptive placement. 25 U.S.C.A. § 1915. However, failure to comply with the placement preferences specified in Section 1915 is not a ground for invalidating a termination order. *See* 25 U.S.C.A. § 1914 (order may be invalidated for violating any provision of sections 1911, 1912, and 1913). Accordingly, we overrule D.S.'s fifth issue.

### SUFFICIENCY OF THE EVIDENCE

In her sixth and seventh issues, D.S. challenges the sufficiency of the evidence supporting the termination of her parental rights under Texas Family Code Section 161.001, subsections (1)(D), (1)(E), and (1)(O) and Section 1912, subsection (d) and (f) of the ICWA.[13] The family code and the ICWA require different burdens of proof to terminate the parent-child relationship. Consequently, different standards of review apply to each.[14]

**Termination Under the Family Code**

The family code permits the termination of parental rights if (1) the parent has engaged in any one of the acts or omissions itemized in Section 161.001(1) of the family code, and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re C.L.C.*, 119 S.W.3d 382, 390 (Tex. App.—Tyler 2003, no pet.). Both elements must be proved by "clear and convincing evidence," and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *In re C.L.C.*, 119 S.W.3d at 390.[15]

There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship, and the burden of proof rests upon the party seeking to deprive the parent of his or her parental rights. *See* *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re C.L.C.*, 119 S.W.3d at 390-91.

---

[13] D.S. does not challenge the sufficiency of the evidence supporting the finding that termination of her parental rights is in the best interest of the child.

[14] A higher burden of proof requires a higher standard of appellate review. *See* *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *see also* *In re N.J.*, 221 P.3d 1255, 1260 (Nev. 2009) (concluding that the state standard applies to state law findings and the ICWA standard applies to federal law findings).

[15] "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2014).

Although the court's charge imposed the beyond a reasonable doubt burden on the state grounds for termination, our review of the sufficiency of the evidence applies the state burden of proof—clear and convincing evidence—to termination of parental rights under the family code. *See* TEX. FAM. CODE ANN. § 161.001(1).

*Standard of Review*

When the burden of proof is clear and convincing evidence, we conduct a legal sufficiency review by looking at all of the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* Thus, it follows that the reviewing court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, but this does not mean that the reviewing court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting our legal sufficiency review, we determine that no reasonable fact finder could form a firm belief or conviction that the matter which must be proven is true, then we will conclude that the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id.* Our inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We consider whether the disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, when viewed in light of the entire record, the disputed evidence is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* In finding evidence factually insufficient, the appellate court should detail why it has concluded that a reasonable fact finder could not have credited disputed evidence in favor of its finding. *Id.* at 267.

The standard of review for legal and factual sufficiency challenges maintains a deferential standard for the fact finder's role, which means the trier of fact is the exclusive judge of the credibility of the witnesses and weight to be given their testimony. *In re C.H.*, 89 S.W.3d 17, 26-27 (Tex. 2002); *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.]

1997, pet. denied). Thus, our review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. *In re C.H.* 89 S.W.3d. at 26.

*Endangering Conduct*

A court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well being of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary that a parent's conduct be directed at the child or that a child actually suffers injury in order for endangerment to exist. *Id.* It is sufficient that the child's well being be jeopardized or exposed to loss or injury. *In re J.J.*, 911 S.W.2d 437, 440 (Tex. App.—Texarkana 1995, writ denied). Danger to the child need not be established as an independent proposition and may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A parent's endangering conduct is evidenced not only by the parent's actions, but also by the parent's omission or failure to act. *See Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 435 (Tex. App.—El Paso 2004, no pet.). Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("An environment which routinely subjects a child to the probability that she will be left alone because her parents are once again jailed, whether because of the continued violation of probationary conditions . . . or because the parents are once again committed to a rehabilitation program, endangers both the physical and emotional well[]being of a child.").

Termination of parental rights under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The requisite endangerment may be found if the evidence shows a parent's course of conduct that has the effect of endangering the child's physical or emotional well being. *Id.* In considering whether a relevant course of conduct has been established, a court properly may consider evidence of conduct that

16

occurred both before and after a child's birth. *Id.* A court may also consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question. *Id.*

## Termination of Parental Rights Under the ICWA

A termination order may be invalidated for the failure to comply with Section 1912. *See* 25 U.S.C.A. § 1914. D.S. contends that the trial court's order should be invalidated due to insufficient evidence supporting the findings required by subsections (d) and (f) of Section 1912.

### *Burden of Proof*

Subsection (f) provides that termination of parental rights requires "evidence beyond a reasonable doubt." 25 U.S.C.A. § 1912(f). However, subsection (d) provides that a party seeking to terminate parental rights "shall satisfy" the court that active efforts have been made and "proved unsuccessful" to prevent the breakup of the Indian family. *See* 25 U.S.C.A. § 1912(d).

The burden of proof required to "satisfy the court" that active efforts were made and "proved unsuccessful" is not specified by the ICWA. *See* 25 U.S.C.A. § 1912. Texas courts have not addressed this issue, nor is there any Supreme Court precedent addressing the burden to be satisfied under subsection (d).

The *Guidelines* provide the following commentary on subsection (d)'s failure to include a burden of proof:

> One commenter recommended that detailed procedures and criteria be established in order to determine whether family support efforts had been adequate. Establishing such procedures and requirements would involve the court in second-guessing the professional judgment of social service agencies. The Act does not contemplate such a role for the courts and they generally lack the expertise to make such judgments.

*Guidelines*, 44 FED. REG. 67,601. We are aware of only one court that has addressed this commentary from the *Guidelines* in determining the applicable standard of review for subsection (d) findings. *See In re G.S.*, 59 P.3d 1063 (Mont. 2002).

In 2002, the Supreme Court of Montana recognized a split of authority among the states regarding the burden of proof required for compliance with Section 1912(d). *Id.* at 1071. This split of authority continues today. Some states require proof beyond a reasonable doubt when the underlying proceeding is for termination of parental rights under Section 1912(f), while others

require a lesser standard based on state laws either as applied to the underlying proceedings or based upon the services provided to the parents. *See id.* at 1071. Ultimately, the Montana Supreme Court determined that the underlying ICWA proceeding determined the burden of proof required—proceedings involving foster care placement required clear and convincing evidence and proceedings involving the termination of parental rights required evidence beyond a reasonable doubt. *Id.*

We agree with the Montana Supreme Court's reasoning. Because the ICWA proceeding in this case concerns the termination of parental rights, we hold that the burden of proof required under subsections (d) and (f) is evidence "beyond a reasonable doubt."

### *Standard of Review*

The beyond a reasonable doubt standard has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787, 61 L. Ed. 2d 560 (1979) (citations omitted). When we review the sufficiency of the evidence pursuant to the ICWA burden of proof requirements, we must determine whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found that the requirements of Section 1912(d) and (f) were satisfied beyond a reasonable doubt. *See id.*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also City of Keller*, 168 S.W.3d at 817 (legal sufficiency review of cases involving termination of parental rights requires the reviewing court to consider all of the evidence, not just evidence favoring the verdict). This standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

D.S. challenges the factual sufficiency of the evidence supporting the ICWA grounds, but Texas no longer applies a factual sufficiency review to challenges of evidence requiring proof beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010) (holding that factual sufficiency standard is indistinguishable from the *Jackson v. Virginia* legal sufficiency standard). Accordingly, we apply the *Jackson v. Virginia* standard in reviewing the sufficiency of the evidence supporting termination under the ICWA.

### *Preventive Measures and Expert Testimony Required*

When a state seeks to terminate the parental rights of an Indian child, it must prove beyond a reasonable doubt that (1) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts

have proved unsuccessful, and (2) the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *See* 25 U.S.C.A. §§ 1912(d), (f), 1914. Whether continued custody of the child by the parent or Indian custodian is likely to result in physical or emotional damage to the child must be supported by evidence that includes testimony from a qualified expert witness. *See* 25 U.S.C.A. § 1912(f).

**The Evidence**

The events leading to K.S.'s removal began prior to her and D.S.'s arrival in Athens, Texas, on January 5, 2013.

*Events Leading to Removal*

On December 19, 2012, K.S. suffered a "bump and bruise" on the left side of her forehead from being hit by a fellow toddler while playing at daycare. On December 24, 2012, D.S. took K.S. to an Oklahoma City hospital and received medication for K.S. for vomiting and diarrhea. At the time of trial, D.S. could not remember whether K.S. had been diagnosed with any kind of head trauma while at the hospital on December 24, 2012.

On Christmas Day, D.S. and K.S. traveled from Oklahoma City to Las Vegas, Nevada, and D.S. took K.S. to a Las Vegas hospital. She claimed that K.S. had "dilated pupils, [an] unsteady gait, altered mental status[,]" and that she was concerned because K.S. had hit her head "maybe 3 [days] ago." At trial, D.S. testified that K.S. was "tired, sluggish, [and] groggy," and that a CAT scan revealed "a minor closed-head injury without loss of conscious[ness]." The CAT scan was never offered or admitted into evidence at trial. Contrary to D.S.'s testimony, the medical records from the Las Vegas hospital stated that

> mom is trying to point out symptoms with child that are not overtly evident: she states pupils are dilated, but they are PEERL and unremarkable, she states [K.S.] is lethargic and glassy, and [K.S.] is alert, happy, cooperative, bouncing around bed. She states [K.S.] cannot focus, but [K.S.] follows all commands, is smiling and interactive in room. She states [K.S.] is not able to walk and [K.S.] is laughing walking around room.[16]

D.S. testified that they stayed in Las Vegas for about four days before they returned to Oklahoma City.

---

[16] The medical records described K.S.'s eyes as "[p]upils equal, round and reactive to light."

On January 4, 2013, D.S. and K.S. traveled from Oklahoma City to Texas with a friend with the intention of going to Beaumont, Texas, but ultimately did not travel beyond Gun Barrel City, Texas. On that day, D.S. took K.S. to a hospital in Oklahoma City, but left before K.S. had been seen by a doctor.[17] Later that evening, D.S. took K.S. to a hospital in Denton, Texas, claiming that K.S. was complaining that "her head hurts, cold/chest congestion," and stated that K.S. was experiencing symptoms of "night sweats," "fatigue," "body aches," "rash," "nasal congestion (not related to allergies or sinus infection)," "chest congestion," and "swollen back[/]neck." The medical records from the Denton hospital show that D.S. told the medical staff that K.S. was "not acting normally," but the medical records did not indicate that K.S. had, or was suffering from, any injury or illness.

After leaving the Denton hospital, D.S. and K.S. continued their trip to Beaumont when D.S. insisted that K.S. again needed to go to the hospital. D.S. had reported that K.S.'s lips were "turning blue," that K.S. was "very lethargic," "really struggling," and "in trouble." At trial, D.S. confirmed that her friend who was driving to Beaumont told her that nothing was wrong with K.S. D.S. disagreed, and had her friend leave her and K.S. "on the side of the road" in Gun Barrel City. D.S. testified that she went to the police station in Gun Barrel City, who "called the ambulance" that brought her to East Texas Medical Center in Athens, Texas.

The Department received a report alleging neglectful supervision of K.S. by D.S. on January 5, 2013. Department investigator Amanda Jordan investigated the allegations and met with D.S. at the hospital in Athens. Jordan testified that the medical staff "had huge concerns of [D.S.] and her behaviors," and described D.S.'s conduct as "manic" and "odd." They reported that D.S. demanded medically unnecessary tests for K.S. and stated that D.S. would run into the room to wake K.S. and then leave K.S. unattended.

Jordan testified that when she entered K.S.'s hospital room, D.S.

> [i]mmediately grabbed [K.S.] by the shoulders and started shaking her. And we were like, what are you doing? And she was like look. She stopped, and she said, "She's having a seizure; she's having a seizure." The child was asleep in the bed. She was not having a seizure. And she said[,] ["S]he has air pockets in her brain and she needs help and the hospital is not doing anything.["]

---

[17] Initially, D.S. testified that she did not remember going to a hospital in Oklahoma City on January 4. Later, after being shown medical records from a hospital in Oklahoma City, she confirmed that she had taken K.S. there.

Jordan testified that D.S. believed K.S. was having a seizure and "if she slept she was going to die." D.S. also suggested multiple diagnoses for K.S. including "a brain aneurysm," "pneumonia," and stated that K.S. was "dying." Jordan confirmed that K.S. had been diagnosed with "acute sinusitis," but testified that she was otherwise healthy. Jordan explained that D.S.'s behavior was concerning because she was exhibiting behavior that was "consistent with someone that may be under the influence of some type of illegal substance."

When Jordan asked D.S. to submit to a drug test at the hospital, D.S. refused and "started screaming that, you know, she's not using drugs; this is not about her and her daughter is dying and we needed to do something and reverted back to expressing that her daughter has pneumonia and yelling her daughter is sick." Jordan testified that after being at ETMC for four to five hours, the Department decided it was in K.S.'s best interest to be removed from D.S.'s care due to D.S.'s behavior.[18] When the Department informed D.S. of the removal, law enforcement was present, and D.S. called 911 and stated that CPS "was kidnapping her child."

*Events After Removal*

After K.S. was removed and placed in foster care, the Department, with D.S.'s help, created a service plan that was designed to help mitigate the reasons K.S. came into care and help D.S. achieve reunification. The service plan was also tailored to accommodate D.S.'s needs by allowing some of her services to be completed in Oklahoma.

The service plan required D.S. to complete a parenting class, a psychological evaluation, attend counseling, submit to random drug testing, and allow announced and unannounced visits to her home.[19] When services were required to be completed in Texas, they were usually available along the Texas-Oklahoma border—Sherman or Gainesville—and Cherokee Nation would transport D.S. to those services.

D.S. completed the parenting class and the psychological evaluation, and attended counseling in Oklahoma. However, testimony by Samantha Robb, D.S.'s caseworker, showed that D.S. was required to complete a psychological evaluation in Texas because the Oklahoma evaluation did not include information relating to the events leading up to K.S.'s removal. Robb explained that the psychological evaluation was to be used to determine whether D.S. could benefit

---

[18] Jordan testified that hospital staff had contacted law enforcement "[d]ue to [D.S.]'s bizarre behaviors."

[19] Testimony suggests that there were other requirements included in the service plan designed to prepare D.S. for reunification, but neither the service plan nor the order requiring D.S. to complete the service plan were admitted into evidence at trial.

from any recommendations that could help her become a better parent. Although D.S. ultimately completed a psychological evaluation in Texas, its results and recommendations were not admitted into evidence.

The service plan also required D.S. to submit to a substance abuse evaluation and random drug testing. The evidence showed that D.S. had been dishonest during her substance abuse evaluation. D.S. submitted to two hair follicle tests that showed negative results. The testimony showed that only one had reliable results and D.S. had also refused to submit to a different drug test despite being ordered to do so by the court.

D.S. was also ordered to release her medical records, but she never did. However, D.S. testified that she was seeking Social Security disability and was in the process of appealing a denial of benefits. She testified that she was entitled to receive disability because she suffered from "social anxiety and manic depression." D.S. stated that she was "manic" after K.S. was taken from her. But she later testified, "I think I just put that on there. I was never diagnosed with manic depression. I was just diagnosed with depression and generalized anxiety."

D.S. was unable to maintain stable employment throughout the pendency of the case. She was terminated at one fast food restaurant after she was arrested for threatening a coworker. D.S. quit her job at another fast food restaurant because "they cut my hours down." By the time of trial, D.S. had been working for a month cleaning a male friend's house and helping him with his shop at a flea market. D.S. testified that she gets paid $300 each week and that she receives government assistance in the form of food stamps and a "utility check for my apartment."

The evidence showed that D.S. had lived in the same apartment for four years, and was forty dollars delinquent on the rent. Crawford visited D.S.'s apartment several times, and described it as "not really all that safe" because of the neighborhood. Although D.S. had maintained that she lived alone, Crawford testified that on the two occasions she went inside D.S.'s apartment, people who had criminal histories were sleeping there. On one occasion, Crawford was not permitted to go into the room where D.S.'s mother and stepfather allegedly were sleeping. The other time involved a scheduled home visit when D.S.'s boyfriend, "Reggie," was found sleeping in D.S.'s bedroom. D.S. refused to disclose Reggie's last name, but Crawford ultimately discovered that Reggie had criminal history involving violence and drug-related offenses. Crawford testified that she told D.S.

22

she really needed to be more careful about who she allowed in her home and, especially, if it was gang-related—somebody who was involved in gang activity, that it may not be her that he may harm but somebody may be coming to her home trying to harm him.

Crawford further testified that D.S. did not seem to understand why it was inappropriate to have someone like Reggie in her home. D.S. was questioned at trial about her refusal to disclose Reggie's last name, and she testified that she did not give Reggie's last name because "I didn't know the information." D.S. was then asked whether it was unusual for her to have an unidentified man in her bed that she has slept with and not known "who he is," to which she responded, "No."

### D.S.'s Criminal Conduct

In 2007, D.S. was charged with assault with a deadly weapon, was incarcerated for eighteen months as a juvenile, and then placed on probation. At the time of trial, D.S. was still on probation for that case, and an application to revoke her probation was pending.

In 2008, D.S. was arrested for driving under the influence with her two oldest children in the vehicle. D.S. was incarcerated for eighteen months. Ultimately, D.S.'s parental rights to her two oldest children were terminated.[20] Despite having her parental rights terminated and being arrested for driving under the influence, D.S. continued to engage in criminal activity by smoking marijuana when K.S. was two or three months old. Nevertheless, D.S. maintained that when she smoked marijuana, K.S. was with D.S.'s mother.

In June 2013 (while this case was pending), D.S. was arrested for threatening to commit an act of violence, and spent three days in jail before she was released on bond. At the time of trial, the charge was still pending, and D.S. had an active warrant for her arrest.[21] D.S. testified that if she could not do a "walk through" upon being arrested, she would have to "sit in [jail] until [she] see[s] the judge." When asked about where K.S. would go if she was in jail, D.S. responded, "I guess she's going to remain at the foster home until I can get out." After being told that K.S. would not be in foster care if her parental rights were not terminated, K.S. testified that K.S. could

---

[20] The father of D.S.'s two oldest children is currently serving a prison sentence for assault with a deadly weapon and rape of a young child.

[21] It is unclear whether the warrant for D.S.'s arrest was for the application to revoke her felony probation, for the threatening charge, or both.

23

stay with her mother, who also had active warrants. D.S. testified that if her mother was arrested while taking care of K.S., D.S.'s "Aunt Roxie" who moved to Tulsa could take care of K.S.

### D.S.'s Visits

When D.S. had visits with K.S., Cherokee Nation would transport D.S. and the Department would transport K.S. to a location halfway between their respective places of residences.[22] The visitation arrangements provided transportation for D.S. for only one of the two visits each month. Crawford testified this arrangement was made because D.S. "needed to be responsible for finding transportation and getting herself to Gainesville [for] the other visit [each] month." Crawford testified that

> it was important for [D.S.] to show some responsibility and show some effort on her part instead of CPS doing everything for her and the tribe doing everything for her, that she take some initiative and be motivated enough to get transportation for two and a half hours to visit her child.

The only visits that D.S. attended were the ones in which she received transportation from Cherokee Nation. D.S. did not attend any visits for the month of March, but the evidence showed that D.S. had phone visitation with K.S. as well.

D.S. generally had good visits with K.S., but testimony showed that there were times D.S. engaged in conduct reminiscent of her behavior that led to K.S.'s removal. D.S. originally had phone visits with K.S. twice each week, but the phone visits were reduced to once a week because D.S. made allegations of abuse in the foster home. Robb testified that during phone conversations, D.S. would ask K.S. several leading questions like, "Are you hurt?" and "What's wrong?" K.S. would sometimes say "owie," which resulted in D.S.'s automatic assumption that K.S. was being hurt. Robb testified that she supervised the phone visits and "I assured D.S. [that] K.S. had nothing wrong with her, and she continued and continued to ask her what was wrong, what had happened; and I had to continue to tell her nothing happened." There were a few visits where D.S. would examine K.S.'s body, asking if K.S. was hurt and would "lift her shirt up to check to see if there were any marks or bruises on K.S. in a public setting [during] a visit." During the one visit in which K.S. actually had a mark under her eye and a "cracked" lip, D.S. did not display any

---

[22] When asked whether K.S. could have been transferred to a foster home in Oklahoma, Crawford testified that Cherokee Nation did not have any ICWA compliant homes available and would not agree to transferring K.S. from one noncompliant ICWA home to another noncompliant ICWA home in Oklahoma.

reaction to K.S.'s injury. Later, D.S. called in three reports of abuse on the foster home, each of which were "ruled out."

### *Remedial Services, Preventive Measures, and Expert Testimony*

When D.S. was incarcerated in the juvenile facility from 2008 to 2010, she worked services and received counseling. D.S. testified that she participated in an aggression replacement training group, Girl Scouts, AA (Alcoholics Anonymous), church, and cooking and parenting classes. According to D.S., she benefitted from participating in each of these programs.

In 2012, D.S. participated in a parenting class again, after K.S. had been temporarily placed in foster care by the Oklahoma Department of Human Services (DHS). The evidence showed that DHS ultimately concluded that K.S.'s placement in foster care was not due to K.S.'s caregiving. But the evidence also showed that in June 2012, D.S. requested that a sexual assault exam be conducted on K.S. D.S. testified that she requested the exam because

> I was incarcerated for six months for DUI and my mother was taking care of her as well as my sister. And when I got back, I didn't know if she had been sexually molested. I wanted her to be checked out.

After the doctor told her what the exam entailed, D.S. said that she no longer wanted the exam to be conducted and maintained that the doctor did not do the exam (despite the Department's questions alluding to medical records showing the contrary). However, D.S. testified that K.S.'s doctor called DHS and D.S. met with a caseworker.

Despite having been provided services by the juvenile facility, the Oklahoma DHS, and the Department, D.S. has continued to make decisions and engage in conduct that led to the removal of K.S., the loss of employment, and the commission of at least one new criminal offense. Although D.S. has been attending counseling, she continues to deny any wrongdoing. This fact, when viewed in light of the evidence showing that D.S. assumed that K.S. was hurt during her visits and the fact that D.S. testified that the medical records of the hospitals where she took K.S. were "lying," supports the inference that the services offered to D.S., not only by the Department, but also the juvenile facility and Oklahoma DHS, proved unsuccessful.[23]

The Cherokee Nation representative, Kristi Crawford, was qualified as an expert witness and testified that she believed the Department engaged in active efforts to reunify D.S. with K.S.

---

[23] Only once did D.S. acknowledge that her conduct at the hospital was inappropriate: "I wouldn't say I was completely acting appropriate, no."

Despite D.S.'s alleged compliance with the Department's service plan, Crawford did not believe D.S. has changed since her parental rights to her two oldest children were terminated. Crawford explained that D.S.'s criminal history and current criminal charges make her future look "uncertain." Additionally, Crawford noted D.S.'s continued association with individuals with criminal history, failure to maintain employment, and failure to correct the conditions that led to K.S.'s removal supported her opinion that D.S.'s continued custody of K.S. could result in physical or emotional harm to K.S.

Crawford acknowledged that she had not seen any emotional or physical damage to K.S. at the hands of D.S. Nevertheless, she maintained that D.S. failed to make the necessary changes to have K.S. returned home, and that it was in K.S.'s best interest for D.S.'s parental rights to be terminated.

Samantha Robb and Diane Dunaway, a CASA Volunteer, echoed Crawford's concerns and noted that D.S. continues to be in denial about the reasons K.S. came into Department care. Robb testified that D.S.'s continued belief that there was something seriously wrong with K.S. raises serious concerns about K.S.'s risk of harm if returned to D.S. Robb believed that if she was returned to D.S., K.S. would be subjected to a substantial risk of harm. Dunaway shared the same concern that K.S. would be subjected to serious harm or emotional abuse by D.S. if returned.

**Conclusion**

Undisputed evidenced showed that D.S. had taken K.S. to several hospitals within a two week period, that D.S. has had her parental rights to two other children terminated, and has a history of criminal convictions, arrests, and pending charges. After viewing the evidence in the light most favorable to the finding, we conclude that the evidence illustrates a course of conduct that endangers K.S.'s physical and emotional well being. *See In re S.D.*, 980 S.W.2d at 763. A reasonable fact finder could form a firm belief or conviction that D.S. engaged in conduct or knowingly placed K.S. with persons who engaged in conduct that endangered the physical or emotional well being of K.S. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.F.C.*, 96 S.W.3d at 266. After reviewing the entire record and considering the disputed evidence, we hold that a fact finder could reasonably have formed a firm belief or conviction about the truth of the Department's allegations under Section 161.001(1)(E) of the family code. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.F.C.*, 96 S.W.3d at 266.

Having viewed the evidence in the light most favorable to the verdict, we conclude that the Department proved beyond a reasonable doubt that (1) active efforts have been made to provide

26

remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful, (2) that the continued custody of K.S. by D.S. is likely to result in serious emotional or physical damage to K.S., and that (3) the finding is supported by testimony from an expert witness. *See* 25 U.S.C.A. §§ 1912(d), (f); ***Jackson***, 443 U.S. at 319, 99 S. Ct. at 2789.

Having found the evidence sufficient to support termination of parental rights under Section 161.001(1)(E) of the family code and Section 1912, subsections (d) and (f) of the ICWA, we overrule D.S.'s sixth and seventh issues.[24]

#### DISPOSITION

Having overruled each of D.S.'s seven issues, we ***affirm*** the judgment of the trial court.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered August 21, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[24] Because the evidence is legally and factually sufficient to terminate D.S.'s parental rights under subsection (1)(E), we need not address D.S.'s challenges to the sufficiency of the evidence relating to subsections (1)(D) and (1)(O) of the family code. *See* TEX. R. APP. 47.1; ***In re C.T.***, No. 12-11-00384-CV, 2012 WL 4502427, at *7 (Tex. App.—Tyler Sept. 28, 2012, pet. denied) (mem. op.) (when evidence is sufficient to support termination under one ground, appellate court need not address sufficiency challenges to other grounds for termination in Section 161.001(1)).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 21, 2014**

**NO. 12-14-00061-CV**

**IN THE INTEREST OF K. S., A CHILD**

Appeal from the 392nd District Court

of Henderson County, Texas (Tr.Ct.No. 2013B-0015)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*