# NO. 12-19-00286-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| | § | *APPEAL FROM THE* |
| *IN THE INTEREST OF* | § | *COUNTY COURT AT LAW NO. 2* |
| *M.A.C., JR., A CHILD* | | |
| | § | *ANGELINA COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

M.A.C. appeals the termination of his parental rights.  In three issues, he challenges the legal and factual sufficiency of the evidence to support the termination order, and contends that his First Amendment rights under the Establishment Clause were violated by a requirement that he and M.A.C., Jr.'s mother separate.  We affirm.

## BACKGROUND

M.A.C. is the father and J.S.C.[1] is the mother of M.A.C., Jr.  On May 2, 2018, the Department of Family and Protective Services (the Department) filed an original petition for protection of M.A.C., Jr., for conservatorship, and for termination of J.S.C.'s and M.A.C.'s parental rights.  The Department was appointed temporary managing conservator of the child, and the parents were granted limited access to, and possession of, the child.

At the conclusion of a bench trial, the trial court found that M.A.C. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), (N), (O), and (P) of Texas Family Code Section 161.001(b)(1).  The trial court also found that termination of the parent-child relationship between M.A.C. and M.A.C., Jr. is in the child's

---

[1] J.S.C. appeals the termination of her parental rights to M.A.C., Jr.  J.S.C.'s appellate counsel concluded that the appeal is frivolous and filed an *Anders* brief.  We address J.S.C.'s appeal by a separate opinion.

best interest. Based on these findings, the trial court ordered that the parent-child relationship between M.A.C. and M.A.C., Jr. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2019); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2019); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2019); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619

S.W.2d 400, 401 (Tex. 1981); ***In re M.D.S.***, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. ***In re J.F.C.***, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. ***Id***.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. ***In re C.H.***, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. ***Id***. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. ***In re J.F.C.***, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. ***Nordstrom v. Nordstrom***, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

### TERMINATION UNDER SECTION 161.001(b)(1)(D) and (E)

In his first issue, M.A.C. argues the evidence is legally and factually insufficient to terminate his parental rights pursuant to subsections (D) and (E) of Texas Family Code Section 161.001(b)(1).

### Applicable Law

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West Supp. 2019). Subsection (D) addresses the child's surroundings and environment. ***In re N.R.***, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. ***In re S.R.***, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine

3

whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2019). Scienter is not required for a parent's own acts under Section 161.001(b)(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra*, 869 S.W.2d at 577-78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *In re N.R.*, 101 S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We have previously concluded it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id*.

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A parent's use of narcotics and its effect on his ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.W.*, 129 S.W.3d at 739. Further, evidence that the parent continued to use illegal drugs even though the parent knew his parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being. *See In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). *Walker*, 312 S.W.3d at 617-18.

Though imprisonment of a parent is insufficient, standing alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. *See Boyd*, 727 S.W.2d at 533–34; *In re M.D.S.*, 1 S.W.3d at 199. Nonetheless, evidence showing a course of conduct that routinely subjects a child to the probability that he will be left alone because his parent is once again jailed, whether because of the continued violation of probationary conditions, or because of a new offense growing out of a continued use of illegal drugs, or because the parent is once again committed to a rehabilitation program, endangers both the physical and emotional well being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

**Analysis**

This case began when Knicole Porter, an investigator with the Department, received an intake report on April 11, 2018, alleging neglectful supervision of M.A.C., Jr. by his parents. At that time, M.A.C., Jr. was two months old. The allegations included concerns that both parents abused methamphetamine, M.A.C. cooked methamphetamine in the home, domestic violence occurred in the home, and the parents suffered from untreated mental health issues. According to Porter, the baby was safe and living with his maternal grandparents. Porter contacted J.S.C. at work and she admitted that the night before, she and M.A.C. used methamphetamine while the baby was in their care. J.S.C. admitted to domestic violence between the parents, including a fight that occurred when she tried to leave. J.S.C. said that at one point, M.A.C. threatened to "beat her like a man" if she left with the baby. Porter said that the domestic violence appeared to be ongoing.

Porter also contacted M.A.C. and told him that she saw M.A.C., Jr., the Department was making a parent-child safety placement with J.S.C.'s parents, and he could have supervised visitation with the baby after he was drug tested. Porter stated that M.A.C. listened to her and after he realized what was happening, he became upset, yelling, and only wanted to talk to J.S.C.

According to Porter, the Department made a parent-child safety placement in which J.S.C. agreed to allow the baby to stay with the maternal grandparents and the Department would conduct a planned removal of the baby. Porter was concerned for the safety of both the baby and J.S.C. due to domestic violence. She stated that the actions of J.S.C. and M.A.C. placed M.A.C., Jr. in danger. J.S.C., but not M.A.C., drug tested. J.S.C. tested positive for amphetamine, methamphetamine, alprazolam, and marijuana.

6

*History with the Department:* In a previous case, M.A.C.'s and J.S.C.'s older daughter tested positive for methamphetamine at birth and aspirated while in the womb. Consequently, the daughter was in the hospital for "quite some time." J.S.C. also tested positive for methamphetamine during that time. According to Porter, J.S.C. worked services and J.S.C.'s daughter was returned to J.S.C. and M.A.C., but was removed "very shortly thereafter," or within the same month. The child was removed after J.S.C. and M.A.C. were arrested and jailed on drug charges. During the incident that led to the arrest, J.S.C. was discovered trying to throw drugs, including K2, into the backseat of the vehicle to hide them, and the drugs were found on her daughter. Her daughter tested positive for cocaine and was placed with, and later adopted by, maternal relatives.

*Criminal charges:* According to the evidence at trial, M.A.C. was arrested five times on criminal charges between January 22, 2019 and April 2, 2019. These charges included driving while license invalid; possession of drug paraphernalia; possession of a controlled substance, penalty group one, one to four grams; possession of a controlled substance, penalty group one, less than one gram; possession of marijuana, less than two ounces, twice; possession of a dangerous drug; and no driver's license or insurance. There was no evidence at trial that M.A.C. resolved any of these criminal charges. Further, in June 2018 and in November 2018, M.A.C. was arrested for possession of drug paraphernalia; tampering/fabricating physical evidence with the intent to impair, a third degree felony; and tampering/fabricating physical evidence.

*Stability of the Home:* According to Department caseworkers, Lindsay Waterman and Christopher Barley, M.A.C. did not demonstrate stability or sobriety. The former caseworker, Kristi Hachtel, was unable to obtain an address for M.A.C. in February 2019, when M.A.C. was released from jail. Barley stated that in order to get an address for M.A.C., he contacted the Sheriff's Department in January 2019. Waterman stated that M.A.C. refused to provide an address when she was assigned the case in March 2019.

*Visitations:* After June 2018, M.A.C. did not contact his caseworker nor ask for, attend, or receive, visitations with M.A.C., Jr. The evidence shows that his next visitation with M.A.C., Jr. was on June 7, 2019, more than a year after his last contact with the child. According to Waterman, M.A.C. demanded visitations and the results of drug tests after March 1, 2019, in order to obtain visitation with M.A.C., Jr. However, he never asked about the child. Waterman stated that the June 7, 2019, visitation was "a little harder than anybody anticipated." She described the child as

being in a room with strangers and that he was uncomfortable. After the visitation, M.A.C. accused the maternal grandmother of setting up the visitation during M.A.C., Jr.'s naptime. However, Waterman scheduled the visitation and stated that it did not occur during the child's naptime.

*Service Plan:* The evidence shows that M.A.C. participated in an Alcohol and Drug Abuse Council (ADAC) screening. Outpatient rehabilitation was recommended because M.A.C. answered "yes" to two questions regarding his child being removed and whether his substance abuse caused problems with his family. When the counselor recommended outpatient treatment, M.A.C. became angry, walked out, and did not complete his paperwork. He never returned to participate in outpatient rehabilitation.

A family plan of service was filed for M.A.C. on June 5, 2018. However, the evidence shows that other than participating in an ADAC screening, M.A.C. did not complete or participate in any services including counseling, maintaining his medication, participating with the Burke Center, attending Department meetings, court hearings, and visitations, or contacting his case worker. Beginning February 2019, M.A.C. participated in random drug testing. He tested positive for methamphetamine in February 2019, and negative in April and May of 2019.

*Recent Changes:* Two months before trial, the parents were married by their pastor and attempted to complete their service plan, obtain a residence and employment, and visit their child. M.A.C. contacted the counseling service two weeks before trial to schedule counseling and complete his service plan. The counselor stated that she could not resume counseling until after the trial. Further, at trial, J.S.C. stated that the parents had a van and were purchasing land and a mobile home in the week after trial. The evidence shows, however, that the parents' pastor owns the van. Additionally, their pastor was purchasing the land and mobile home, and would allow them to live there and pay it off.

## Conclusion

From the above evidence, a reasonable fact finder could determine that M.A.C. had a lengthy criminal history, recently as two months before trial, that he never denied using methamphetamine while in possession of the child, and that he possessed drugs while in the possession of an older child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D)(E). The fact finder could also form a firm belief or conviction that M.A.C. demonstrated a lack of stability or sobriety, his home environment was unstable, he did not participate in or complete any of his services required by the Department, and he did not contact or visit his child for over a year. *See **id.***

8

Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that M.A.C. knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical and emotional well being of the child; and engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See In re J.F.C.*, 96 S.W.3d at 266.

Although M.A.C. argued that all the evidence at trial derived from J.S.C., who he accused of lying, and that after they married, "everything fell into place," this evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that M.A.C. knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical and emotional well being of the child; and engaged in conduct, or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See In re C.H.*, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of M.A.C.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule M.A.C.'s first issue as to subsections (D) and (E) of Texas Family Code Section 161.001(b).[2]

## BEST INTEREST OF THE CHILD

In his second issue, M.A.C. argues the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in the child's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the

---

[2] Because we conclude that the evidence is legally and factually sufficient to support termination of M.A.C.'s parental rights under subsection (b)(1)(D) and (E), we need not address his issues regarding subsections (b)(1)(N), (b)(1)(O), and (b)(1)(P) of Section 161.001(b)(1). *See* TEX. FAM. CODE ANN. § 161.001(b)(1); TEX. R. APP. P. 47.1; *see also In re K.S.*, 448 S.W.3d 521, 545 n.24 (Tex. App.—Tyler 2014, pet. denied) (when evidence is sufficient to support termination under one ground, appellate court need not address sufficiency challenges to other grounds for termination in Section 161.001(b)), *but see In re N.G.,* 577 S.W.3d 230, 237 (Tex. 2019) (due process and due course of law requirements mandate that an appellate court detail its analysis in an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the family code if a parent raises such issues.).

individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

**Analysis**

The evidence discussed above shows that M.A.C. has a lengthy criminal history, as recent as two months before trial, he never denied using methamphetamine while in possession of the

10

child, he possessed drugs while in possession of an older child, he lacked stability or sobriety, his home environment was unstable, he did not participate in or complete the services required by the Department, and he did not contact or visit his child for over a year. Further, M.A.C. demonstrated no proof of employment, although his pastor stated that he employed M.A.C. at his home and church for approximately $100.00 per day. M.A.C.'s pastor provided access to a vehicle and residence, which the pastor purchased. His pastor allowed him to use the van and live in a home, to be purchased after trial.

The evidence also showed the caseworkers' concern about domestic violence between the parents. According to Barley, J.S.C. went to a women's shelter because she did not feel safe living with M.A.C. Barley stated that at one time, J.S.C. appeared with a busted lip and admitted that M.A.C. hit her in the face. J.S.C. characterized the incident as "just a little fight" and not a big deal. One caseworker described J.S.C.'s and M.A.C.'s relationship as "toxic" and J.S.C.'s maternal stepfather stated that the intensity of their arguments disturbed him. The stepfather stated that he had to retrieve J.S.C. from M.A.C.'s house numerous times in the middle of the night.

J.S.C. claimed that most of her previous admissions about domestic violence and drug abuse were lies.[3] Although she admitted that M.A.C. abused drugs, J.S.C. denied any violence between them. According to J.S.C., she lied in order to live at the women's shelter, telling them that M.A.C. was abusive and used cocaine. If she told the court that she was scared of M.A.C., it was not true. She did not take M.A.C. seriously when he threatened to "beat her like a man."

At trial, she denied that M.A.C. ever used cocaine and claimed that she had not used cocaine since she was a teenager. She could not explain why her older daughter tested positive for cocaine. She admitted that in April 2018, M.A.C. abused drugs. She denied that M.A.C. abused drugs while she was in and out of a women's shelter. Further, she stated that she lied to Porter when claiming that both parents used methamphetamine while in possession of the child.

The CASA volunteer described M.A.C., Jr. as doing great and beginning to talk. After his visitation with both parents in June 2019, he had a setback, becoming clingy and crying at church and daycare. Both caseworkers and the CASA volunteer recommended that termination of M.A.C.'s parental rights was in the best interest of the child. According to Waterman, M.A.C.'s history indicated his instability and lack of sobriety. The caseworkers also appeared to be

_____

[3] We note that M.A.C. did not testify at trial.

11

concerned about M.A.C.'s lack of interest in the child, until recently, and its affect on the child, and his lack of interest in working services, until recently.

## Conclusion

After viewing the evidence in the light most favorable to the finding and applying the statutory and *Holley* factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of M.A.C.'s parental rights was in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Although some evidence might weigh against the finding, such as M.A.C. being sober since April 2019 and obtaining employment two months before trial, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating M.A.C.'s parental rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule M.A.C.'s second issue regarding best interest.

## FIRST AMENDMENT

In his third issue, M.A.C. contends that in violation of the Establishment Clause of the First Amendment to the United States Constitution, the Department tried to prevent the relationship between M.A.C. and J.S.C. from ending in marriage on their pastor's advice and requiring them to separate. However, M.A.C. failed to raise his complaint in the trial court. Accordingly, his constitutional complaint has been waived. *See* TEX. R. APP. P. 33.1(a); *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) ("[T]he rules governing error preservation must be followed in cases involving termination of parental rights, as in other cases in which a complaint is based on constitutional error."); *In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003) (observing that in parental-termination cases, "adhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose"); *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) ("In termination cases, judicial economy is not just a policy—it is a statutory mandate.... Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution."); *Texas Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (refusing to consider merits of constitutional claims that were not asserted in court below).

12

## DISPOSITION

Having overruled M.A.C.'s first and second issues, and determining that he waived his third issue, we *affirm* the judgment of the trial court.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered February 12, 2020.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 12, 2020**

**NO. 12-19-00286-CV**

**IN THE INTEREST OF M.A.C., A CHILD**

Appeal from the County Court at Law No. 2
of Angelina County, Texas (Tr.Ct.No. CV-00282-18-05)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*